In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00053-CV


______________________________






IN THE MATTER OF S.C.





 


On Appeal from the County Court Sitting as Juvenile Court


 Lamar County, Texas


Trial Court No. 46-CJV-05




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Chief Justice Morriss



O P I N I O N


 Who started the pushing that morning at Paris High School was disputed. All agreed that
S.C. and Cleda Brownfield were at cross purposes before normal school hours began. S.C., then a
fourteen-year-old high school freshman, wanted into the school building. Brownfield, a "special
services aide, teacher's assistant," was tasked to keep out all students except those having business
which specifically authorized early entry. (1) S.C. thought her business justified her early entry;
Brownfield ruled to the contrary. The ensuing altercation resulted in S.C. being charged with, tried
for, and found guilty by a six-person jury as having engaged in, delinquent conduct by assaulting a
public servant. (2) See Tex. Fam. Code Ann. § 54.03 (Vernon Supp. 2006). 

 On appeal, (3) S.C. contends that the evidence is insufficient because the State did not prove
that S.C. was under seventeen years of age; that Brownfield was a school teacher as alleged in the
State's petition; or that Paris High School is a governmental entity, a requirement to establish that
Brownfield was a public servant. S.C. also argues that she had ineffective assistance of counsel at
trial. (4)

 We affirm the judgment of the trial court because we hold that (1) S.C. did not contest that
she was under seventeen years of age, (2) the evidence is sufficient to establish that Brownfield was
a public servant, (3) the evidence is sufficient to establish that Paris High School is a governmental
entity, and (4) ineffective assistance of counsel has not been shown.

(1) S.C. Did Not Contest that She Was Under Seventeen Years of Age

 S.C.'s first contention is that the proceeding should be reversed because the State provided
no evidence that she was a juvenile. (5) The State's response is that the Texas Family Code requires
the State to plead that S.C. is within the jurisdictional age range, but does not require the State to
later adduce evidence on that point unless the matter is otherwise put in issue by the juvenile.

 This issue is decided for us by the Texas Family Code. The juvenile justice code covers all
cases involving the delinquent conduct of a person who is within the definition of a child. Tex. Fam.
Code Ann. § 51.04 (Vernon 2002). A child is a person ten years of age or older and under seventeen
years of age. Tex. Fam. Code Ann. § 51.02(2) (Vernon Supp. 2006). Any objection to the trial
court's jurisdiction over the child because of age must be raised at the adjudication hearing or
discretionary transfer hearing; otherwise, the juvenile waives the right to object later on that basis. 
Tex. Fam. Code Ann. § 51.042 (Vernon 2002); see In re E.D.C., 88 S.W.3d 789 (Tex. App.--El
Paso 2002, no pet.).

 Because it was not raised to the trial court, any complaint about age has been waived, per
statutory fiat. We overrule this point of error.

(2) The Evidence Is Sufficient to Establish that Brownfield Was a Public Servant

 S.C.'s next contention is that the evidence is insufficient because the State did not prove that
Brownfield was a "school teacher," but instead proved only that she was a "teacher's aide." Thus,
she argues, the petition's allegations were not met, and we should find the evidence insufficient.

 The jury was charged to determine whether S.C. had committed delinquent conduct by
committing assault on a public servant. See Tex. Penal Code Ann. § 22.01 (Vernon Supp. 2006). 
Among other things, as presented to the jury, that includes "an officer, employee, or agent of
government." 

 The petition alleges that S.C. caused bodily injury to 

 Cleda Brownfield, a school teacher, and a person said defendant knew was a public
servant, while Cleda Brownfield was lawfully discharging an official duty, or in
retaliation or on account of exercise of official power or performance of an official
duty as a public servant, by pushing Cleda Brownfield.

On appeal, S.C. focuses on a single portion of the petition, the language describing Brownfield as
a school teacher. S.C. argues that the evidence does not support a finding that Brownfield was a
school teacher, and cites a series of criminal cases involving fatal variances between the allegation
and the proof. (6)

 This is an allegation of criminal action, the truth of which is determined by the fact-finder. 
Thus, we apply the analysis used in criminal cases to review alleged charge error, or claims that the
evidence is insufficient to support a jury's determination.

 In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light
most favorable to the verdict and determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. Johnson v. State, 23 S.W.3d 1, 7 (Tex.
Crim. App. 2000).

 In a factual sufficiency review, we also view all the evidence, but do so in a neutral light and
determine whether the evidence supporting the verdict is so weak that the jury's verdict is clearly
wrong or manifestly unjust or against the great weight and preponderance of the evidence. Roberts
v. State, 220 S.W.3d 521 (Tex. Crim. App. 2007); Marshall v. State, 210 S.W.3d 618, 625 (Tex.
Crim. App. 2006).

 The Texas Court of Criminal Appeals has mandated that sufficiency of the evidence is to be
analyzed under the hypothetically correct jury charge. Gharbi v. State, 131 S.W.3d 481, 483 (Tex.
Crim. App. 2003) (allegation which is not statutory element or "an integral part of an essential
element of the offense" need not be included in hypothetically correct jury charge); see Fuller v.
State, 73 S.W.3d 250, 252 (Tex. Crim. App. 2002) (allegation which is not statutory element need
not be included in hypothetically correct jury charge); see also Gollihar v. State, 46 S.W.3d 243, 256
(Tex. Crim. App. 2001).

 A variance occurs when there is a discrepancy between the allegations in the charging
instrument and the proof at trial. Hart v. State, 173 S.W.3d 131, 144 (Tex. App.--Texarkana 2005,
no pet.) (quoting Gollihar, 46 S.W.3d at 246). "The widely-accepted rule, regardless of whether
viewing variance as a sufficiency of the evidence problem or as a notice-related problem, is that a
variance that is not prejudicial to a defendant's 'substantial rights' is immaterial." Id. (quoting
Gollihar, 46 S.W.3d at 247-48; and referencing Rojas v. State, 986 S.W.2d 241, 246 (Tex. Crim.
App. 1998)).

 To determine whether a defendant's "substantial rights" have been prejudiced, we consider
two questions: whether the indictment, as written, informed the defendant of the charge against him
or her sufficiently to allow such defendant to prepare an adequate defense at trial, and whether
prosecution under the deficiently drafted indictment would subject the defendant to the risk of being
prosecuted later for the same crime. See Dickey v. State, 189 S.W.3d 339, 345 (Tex.
App.--Texarkana 2006, no pet.) (citing Gollihar, 46 S.W.3d at 248).

 In this instance, the statute criminalizes assault on a public servant. It is not limited to assault
on a school teacher. Tex. Penal Code Ann. § 22.01(b)(1). It is undisputed that Brownfield was
a teacher's aide employed by the Paris Independent School District at the time of the altercation. A
"public  servant"  is  "a  person  elected,  selected,  appointed,  employed,  or  otherwise  designated
as . . . an officer, employee, or agent of government." Tex. Pen. Code Ann. § 1.07(a)(41)(A)
(Vernon Supp. 2006). Thus, the evidence shows that Brownfield was a public servant. See Moore
v. State, 143 S.W.3d 305, 311 (Tex. App.--Waco 2004, pet. ref'd). 

 The petition clearly provides sufficient information for the defendant to prepare an adequate
defense at trial. The State was not required to prove the more specific allegation, but only what was
required by the hypothetically correct jury charge: that Brownfield was a public servant.

 A number of courts have expressly answered the question by concluding that public school
teachers fall within the broad definition of "public servant" provided by the current version of
Section 1.07(a)(41)(A) of the Texas Penal Code. See In re J.P., 136 S.W.3d 629, 630 (Tex. 2004)
(juvenile assaulted public servant per Section 22.01(b)(1) by hitting and kicking public school
teacher); Moore, 143 S.W.3d at 311 (school superintendent was "public servant" under Section
1.07(a)(41)(A)); In re F.C., No. 03-02-00463-CV, 2003 Tex. App. LEXIS 4709, at *10-11 (Tex.
App.--Austin June 5, 2005, no pet.) (mem. op., not designated for publication) (teacher at Dobie
Middle School was "public servant" for purposes of Section 22.01(b)(1)); In re J.L.O., No. 03-01-00632-CV, 2002 Tex. App. LEXIS 5730, at *8-9 & n.1 (Tex. App.--Austin Aug. 8, 2002, no pet.)
(mem. op., not designated for publication) (education assistant at public school satisfied Texas Penal
Code definition, which Legislature intentionally made broad "to extend the law's protection to all
school employees"); In re B.M., 1 S.W.3d 204, 207 (Tex. App.--Tyler 1999, no pet.) (public
servants include employees of independent school districts).

 Accordingly, we conclude that Brownfield's undisputed testimony that she was a "teacher's
aide" employed by the Paris Independent School District at Paris High School provided legally and
factually sufficient evidence to establish this element of the offense. See In re L.M., 993 S.W.2d
276, 284 (Tex. App.--Austin 1999, pet. denied); In re P.N., No. 03-04-00751-CV, 2006 Tex. App.
LEXIS 6878 (Tex. App.--Austin Aug. 4, 2006, no pet.) (mem. op., not designated for publication).


(3) The Evidence Is Sufficient to Establish that Paris High School Is a Governmental Entity

 In a corollary argument, S.C. contends that the State failed in proving that Paris High School
was a governmental entity. The law clearly is that "an independent school district is an agency of
the state." Barr v. Bernhard, 562 S.W.2d 844, 846 (Tex. 1978); Guin v. State, 209 S.W.3d 682, 684
(Tex. App.--Texarkana 2006, no pet.); Zuniga v. Navarro & Assoc., 158 S.W.3d 663, 670 (Tex.
App.--Corpus Christi 2005, pet. denied). (7) Although, except for Guin, the cited cases are generally
connected with attempts to impose negligence liability on school districts, we see no reason to treat
this type of situation any differently when acknowledging the underlying nature of an independent
school district as a governmental entity.

 We find this argument likewise to be without merit.

(4) Ineffective Assistance of Counsel Has Not Been Shown

 A juvenile has a constitutional and statutory right to effective assistance of counsel in a
juvenile adjudication proceeding. See In re R.D.B., 102 S.W.3d 798, 801 (Tex. App.--Fort Worth
2003, no pet.); In re K.J.O., 27 S.W.3d 340, 342 (Tex. App.--Dallas 2000, pet. denied); In re
R.D.B., 20 S.W.3d 255, 258 (Tex. App.--Texarkana 2000, no pet.).

 The effectiveness of counsel's representation in a juvenile proceeding is reviewed under the
familiar, two-pronged Strickland v. Washington standard. 466 U.S. 668, 687-88 (1984); R.D.B., 20
S.W.3d at 258. Appellant must show that his or her counsel's performance was deficient and that
the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687. An allegation of
ineffective assistance of counsel must be affirmatively demonstrated by the record. Thompson v.
State, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). In this case, unlike most, there was a hearing
conducted by appellate counsel, Gary Waite, questioning trial counsel, S. Wesley Newell, in
connection with S.C.'s motion for new trial. Accordingly, we have a record providing evidence
about a number of the arguments made on appeal.

 Appellate counsel first contends that trial counsel was ineffective because he did not obtain,
before trial, S.C.'s medical or school records or the services of a mental health provider to help
"determine whether [S.C.] lacked substantial capacity to either appreciate the wrongfulness of her
conduct or to conform her conduct to the requirements of the law." It is also argued that trial counsel
was inadequate because he did not "talk to his client to assess her mental condition."

 This issue becomes important only if there is actually evidence that S.C. lacked "substantial
capacity." It is clear from the record of the hearing on the motion for new trial that S.C. had a long
and storied disciplinary history with the school, that she had difficulty controlling her behavior, and
that she had been diagnosed with Attention Deficit, Hyperactivity Disorder (ADHD). Also, S.C.'s
doctor, Martha J. Brown, who had declined to testify favorably for her, had diagnosed her with an
anxiety disorder. There is, however, no evidence to show that any of those matters are such as would
undermine S.C.'s culpability for her actions, to show any substantial or gross impairment of behavior
or judgment, or to raise an issue of her capacity to stand trial. (8) No evidence suggests a defect that
would provide a direct defense to a charge of assault. Even at the hearing on the motion for new
trial, nothing showed that S.C.'s condition raised the lack of substantial capacity, requiring a different
result at trial. (9)

 Trial counsel testified at the hearing that he intentionally chose not to pursue those lines of
investigation based on the responses from Brown, who explained that Brown would not be a good
witness for S.C. Newell testified that he had originally intended to attempt to attack the mens rea
component using Brown, but Brown told him that her testimony would hurt S.C.'s case. Newell
testified that Brown's response caused him to change his trial strategy. Further, in a letter sent in
connection with a request that S.C. be placed in her own home for teaching, Brown had explicitly
refused to suggest that the school be required to provide home-bound teachers since S.C. could
behave in structured environments.

 Newell had enough information available to justify making a tactical decision to pursue other
defensive theories instead of spending time, energy, and his client's money on a theory that showed
little or no chance of success. 

 S.C. also argues that counsel was ineffective because he had not spent an adequate amount
of time with his client and with witnesses. (10) Newell's testimony shows that he had made trips from
Dallas to Paris to meet with S.C. and her family, that he had spoken over the telephone to S.C.'s
mother a number of times and to S.C. once regarding the case, that he had obtained a list of
witnesses from the mother, including only S.C., classmates, and Brown, and that he spoke with four
female classmates of S.C. before trial, three of whom testified. 

 Newell's testimony is somewhat inconsistent as to the classmates, but it appears that he had
contacted them earlier by telephone about appearing at the trial. Then Newell contacted them just
before trial and during breaks while the State presented its case before his portion of the case began
about the incident. Newell pointed out, accurately, that the case came down to a swearing match
between multiple adult teachers and administrators on one side, and the students on the other side,
and that he had to deal with inconsistent stories told by those students, the only available defense
witnesses. He also pointed out, again accurately, that the situation itself was not complex and that
he had altered his strategy in an attempt to use the most effective theory available. This does not
demonstrate ineffective assistance of counsel.

 S.C. also contends that counsel was ineffective at voir dire because he did not question the
jury panel about S.C.'s right not to testify, about whether the panelists had relatives or friends in law
enforcement or knew the witnesses, about the burden of proof and reasonable doubt concepts, or
about their familiarity with the case. S.C. also complains because counsel did not question the venire
panel or discuss defenses.

 The record of voir dire, however, contains considerable discussion about the presumption of
innocence, about the State's burden of proof, and about the knowledge of the parties and witnesses. 
It is also apparent that the State had previously discussed the reasonable-doubt concept, S.C.'s
constitutional right not to testify and not to have the failure to testify held against her, and the
associated burden of proof. The State questioned the witnesses about their relationship with the
school system, their familiarity with the respondent, and their familiarity with Brownfield or any 
of the State's other witnesses. 

 This is not a situation, like the one in Goodspeed, (11) where counsel asked no questions at all,
or asked only questions that were irrelevant to the matters at hand. Counsel spent his time with the
jurors on areas that he deemed important, and did not re-ask questions adequately covered by the
State. We are not prepared to state that his conduct of voir dire was constitutionally inadequate. Appellate counsel also throws in a smorgasbord of other alleged shortcomings by trial
counsel. He complains that trial counsel's unfamiliarity with juvenile law was apparent because he
did not realize that the State's offer of two years in the TYC was not a possible sentence. (12) He
complains that trial counsel failed to object to the court's failure to admonish S.C. pursuant to
Section 54.03 of the Texas Family Code, though failing to suggest how such a failure might have
been harmful. He complains because trial counsel did not have a list of the State's witnesses in order
to ask the panel if they knew any of them. The State, however, did question panel members about
their familiarity with most of those witnesses. Appellate counsel complains that trial counsel did not
adequately prepare for the disposition hearing, apparently because he did not verify that a social
study was done and did not have experts available to testify about S.C.'s mental condition. There
is no explanation of any of those contentions, nor any explanation of how harm might have ensued
from the alleged shortcomings.

 In evaluating the first prong of the Strickland inquiry, we presume counsel's competence; an
appellant must rebut this presumption by proving that the challenged action was not sound trial
strategy. Kimmelman v. Morrison, 477 U.S. 365, 384 (1986) (citing Strickland, 466 U.S. at 688-89
(defendant must overcome presumption that, under the circumstances, the challenged action might
be sound trial strategy)). Evidence was presented suggesting that the strategy used by counsel was
logical, if ultimately ineffective. The evidence also shows that counsel contacted the potential
witnesses, and spoke to them about their testimony. It is also apparent that the proof of the incident
itself was not particularly complex or convoluted. We are not prepared to say that counsel's
decisions were such as to constitute ineffective assistance of counsel.

 Counsel's conduct of voir dire was not inadequate. Although any complaint about the
"missing" admonishment must be preserved before its absence could be reviewed, it is apparent from
S.C.'s actions and the conduct of the proceeding that all of the matters involved were fully known
by S.C. There is no argument or explanation concerning any missing "social study," and no evidence
suggests that any further actions concerning S.C.'s mental state would have been fruitful.

 Even if all of the complained-of actions or inactions were indeed below the norms for
competent counsel, nothing in this record suggests that, without those actions or inactions, this case
would have had a different outcome. The point of error is overruled.

 We affirm the judgment.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: May 9, 2007

Date Decided: July 5, 2007

1. One of Brownfield's duties at the time of the altercation was to keep unauthorized students
out of the school building before the bell rang for general classes at 8:30 a.m. The first bell rang at
8:00 a.m. At that time, authorized students could come in for tutorials and other specified purposes
until 8:05 a.m., when the second bell rang. At that point, the doors were again closed until 8:30 a.m.,
when general admission began. Brownfield and other school personnel testified that S.C. initiated
physical contact before 8:30 by pushing Brownfield. S.C. and two classmates testified that
Brownfield initiated the contact. S.C. also stated that Mr. Fleming, a science teacher, pushed S.C.
while stepping on her shoe string and that, as a result, she fell and stuck herself in the hand with a
pencil she was carrying.
2. After the trial court heard further evidence, it committed S.C. to the Texas Youth
Commission (TYC) for an indeterminate sentence. See Tex. Fam. Code Ann. § 54.04 (Vernon
Supp. 2006).
3. We note that, though numerous reports in the public media discuss S.C.'s case as being one
involving issues of racial discrimination, no racial issues have been raised in this appeal.
4. At oral argument, acknowledging that S.C. has now been released from TYC, counsel
waived his arguments that the trial court abused its discretion at the disposition phase by committing
her for an indeterminate sentence.
5. Juvenile proceedings are unique. Although these proceedings are not handled in the criminal
justice system and are considered to be civil proceedings, they are quasi-criminal in nature. In re
M.A.F., 966 S.W.2d 448, 450 (Tex. 1998); see Tex. Fam. Code Ann. § 51.17 (Vernon Supp. 2006). 
The terms used to describe juvenile proceedings are euphemisms that are parallel to criminal
proceedings: the adjudication is the guilt/innocence trial, while the disposition is equivalent to a
sentencing proceeding. See In re K.T., 107 S.W.3d 65, 67 (Tex. App.--San Antonio 2003, no pet.).


 Juvenile delinquency proceedings are governed by the Texas Family Code. In re R.J.H., 79
S.W.3d 1, 6 (Tex. 2002); In re M.D.G., 180 S.W.3d 747, 749 (Tex. App.--Eastland 2005, no pet.). 
Under applicable statutes and caselaw, civil and criminal rules apply at different stages of the same
proceeding. Section 51.17 of the Texas Family Code provides that the Texas Rules of Civil
Procedure shall apply, the Texas Code of Criminal Procedure and the applicable criminal caselaw
shall govern the discovery process, and the Texas Rules of Evidence, as they apply to criminal cases,
shall be used during the judicial proceeding. Tex. Fam. Code Ann. § 51.17 (Vernon Supp. 2006). 
The burden of proof in an adjudication hearing is the criminal burden: beyond a reasonable doubt. 
Tex. Fam. Code Ann. § 54.03(f) (Vernon Supp. 2006). If the trier of fact determines the juvenile
engaged in delinquent conduct, a separate disposition hearing is conducted after the adjudication
hearing. Tex. Fam. Code Ann. §§ 54.03(h), 54.04.
6. See generally Weaver v. State, 551 S.W.2d 419 (Tex. Crim. App. 1977) (Ruger, or Luger,
pistol).
7. See generally Tex. Civ. Prac. & Rem. Code Ann. § 101.001(3)(B) (Vernon Supp. 2006)
(governmental unit included any "school district").
8. A child is not responsible for the conduct if as a result of mental illness or mental retardation
he or she lacks substantial capacity either to appreciate the wrongfulness of his or her conduct or to
conform his or her conduct to the requirements of the law. Tex. Fam. Code Ann. § 55.51(a)
(Vernon 2002). Section 55.51(b) states that on a motion by a party alleging that the child may not
be responsible as a result of mental illness or retardation, the court shall order the child to be
examined under Section 51.20, and obtain an expert opinion about whether the child is responsible. 
Section 51.20 allows a court to order a child examined by an expert to determine whether the child
has a mental illness as defined by Section 571.003 of the Texas Health and Safety Code, or is
mentally retarded. 
9. Mental illness is defined as an illness, disease, or condition--other than epilepsy, senility,
alcoholism, or mental deficiency--that either substantially impairs a person's thought, perception
of reality, emotional process, or judgment; or grossly impairs behavior as demonstrated by recent
disturbed behavior. Tex. Health & Safety Code Ann. § 571.003(14) (Vernon Supp. 2006).
10. Compare K.J.O., 27 S.W.3d at 345, where the court concluded that counsel had wholly
failed to investigate the facts and circumstances surrounding the appellant's alleged involvement in
the underlying offense. The court went on to find a reasonable probability that, had appellant's
counsel questioned the available witnesses, she would have been able to establish an alibi for the
appellant on the night she was arrested, resulting in a different outcome at trial.
11. Goodspeed v. State, 167 S.W.3d 899 (Tex. App.--Texarkana), rev'd, 187 S.W.3d 390 (Tex.
Crim. App. 2005).
12. In their briefing and in oral argument, the parties have not fleshed out the merits of
counsel's underlying proposition concerning viable sentencing alternatives, nor do we take a position
on the merits of that proposition.


75pt;height:106.5pt;visibility:visible;mso-wrap-style:square'>
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-11-00034-CR

                                                ______________________________

 

 

JAMES
CHRISTOPHER EMMERS, Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                         On Appeal from the 6th Judicial District Court

                                                             Lamar County, Texas

                                                            Trial
Court No. 23765

 

                                                            
                                      

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                            Memorandum Opinion by Justice Moseley








                                                     MEMORANDUM 
OPINION

 

            James
Christopher Emmers was charged in a two-count indictment with possession of
methamphetamine with intent to deliver in a drug-free zone and possession of
marihuana in a drug-free zone.  Both
counts charged Emmers as a repeat offender. 
Prior to trial, Emmers filed a motion to suppress evidence, which the
trial court denied.  After pleading
guilty to both charges, Emmers was sentenced to two twenty-year terms of imprisonment,
to run concurrently.  Emmers appeals the
trial courts denial of his motion to suppress evidence.  We affirm the judgment of the trial court.

I.          FACTS

            The only testimony
presented during Emmers suppression hearing was that of Officer Joseph Gordon
of the Paris Police Department.  Gordon
testified that on the night of March 18, 2010, he was patrolling the area of
5th and Tudor Streets.  As he crossed the
intersection of 5th Northeast and Provine Streets, Gordon saw a vehicle
approaching in the opposite lane of traffic. 
The vehicle, operated by Emmers, crossed over into the oncoming lane of
traffic and then swerved back into the correct lane.  There are no dividers between the lanes.  There was no traffic in the area other than
Gordon, who was driving at a slow rate of speed.  After crossing into Gordons lane and
swerving back into his lane, Emmers backed into an area known as the
Cornet.  In doing so, Emmers backed in
front of Gordon, causing Gordon to yield in order to avoid an accident.  At that point, Gordon made contact with Emmers
for failing to maintain a single lane of traffic and for failure to yield the
right-of-way to oncoming traffic.  Emmers
handed Gordon a piece of paper and then fled on foot.  Gordon was able to apprehend and arrest Emmers.  Upon conducting an inventory search of
Emmers vehicle incident to arrest, Gordon located over a pound of marihuana
and approximately thirty grams of methamphetamine.  

            Emmers
filed a motion to suppress this evidence, alleging the traffic stop was
unlawful.  At the suppression hearing,
Gordon testified that he approached Emmers vehicle because Emmers failed to
maintain a single lane of traffic and because Emmers failed to yield the right-of-way
to oncoming traffic.  Both the State and Emmers
argued over whether Gordon had reasonable suspicion to make the stop.  See
Terry v. Ohio, 392 U.S. 1 (1968).

II.        MOTION TO SUPPRESS

            In his sole
appellate point, Emmers argues that the trial court erred in denying his motion
to suppress because the facts here do not rise to the level of reasonable
suspicion necessary to justify the traffic stop.  

            A.        Standard
of Review and Applicable Law

            We review a trial
courts decision on a motion to suppress evidence by applying a bifurcated
standard of review.  Graves v. State, 307 S.W.3d 483, 489 (Tex.
App.Texarkana 2010, pet. refd); Rogers v. State, 291 S.W.3d 148, 151 (Tex. App.Texarkana 2009, pet. refd).
While we defer to the trial court on its determination of historical facts and
credibility, we review de novo its application of the law and determination of
questions not turning on credibility.  Wiede
v. State, 214 S.W.3d 17, 25
(Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d 85, 89 (Tex.
Crim. App. 1997); Graves,
307 S.W.3d at 489.  We also afford
deference to a trial courts application of law to fact questions, also known
as mixed questions of law and fact, if the resolution of those questions
turns on an evaluation of credibility and demeanor.  Guzman, 985 S.W.2d at 89. 
Because no findings of fact or conclusions of law were filed, we will
assume the trial court made implicit findings of fact that support its ruling
as long as those findings are supported by the record.  Torres
v. State, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005).  The trial courts evidentiary ruling will be
upheld on appeal if it is correct on any theory of law that finds support in
the record.  Gonzalez v. State, 195 S.W.3d 114, 126 (Tex. Crim. App. 2006).

            A
stop by a law enforcement officer amounts to a sufficient intrusion on an
individuals privacy to implicate the Fourth Amendments protections against
unreasonable searches and seizures.  Carmouche v. State, 10 S.W.3d 323, 328
(Tex. Crim. App. 2000).  However, it is
well-established that a law enforcement officer may stop and briefly detain a
person suspected of criminal activity on less information than is
constitutionally required for probable cause to arrest.  Terry,
392 U.S. at 21; Carmouche, 10 S.W.3d
at 328.  In order to stop or briefly
detain an individual, an officer must have reasonable suspicion that an
individual is violating the law.  Ford v. State, 158 S.W.3d 488, 492 (Tex.
Crim. App. 2005).

            Gordon
testified that he stopped Emmers for what he believed to be two different
traffic violations.  To justify a traffic
stop, the officer must have observed specific objective, articulable facts
which, in light of the officers experience and personal knowledge, together
with inferences from those facts, would warrant a reasonable person to believe
a traffic violation occurred.  Id. at 49293; Bass v. State, 64 S.W.3d 646, 648 (Tex. App.Texarkana 2001, pet.
refd).  This objective standard
disregards the subjective intent of the officer making the stop, and is based
on the totality of the circumstances.  Ford, 158 S.W.3d at 49293.

            B.        Failure
to Maintain Single Lane of Traffic

            Emmers
initially asserts the trial court erred in determining that Gordon had
reasonable suspicion to stop him based on the fact that he briefly crossed into
Gordons lane of traffic.  Section
545.060(a) of the Texas Transportation Code provides:

            Driving on Roadway Laned for Traffic

            (a)        An operator on a roadway divided into
two or more clearly marked lanes for traffic:

 

                        (1)        shall drive as nearly as practical
entirely within a single lane; and

 

                        (2)        may not move from the lane unless that
movement can be made safely.

 

Tex.
Transp. Code Ann. § 545.060 (West 2011).[1]  Gordon testified that there are no dividers
between the lanes of 5th Northwest Street, and the lanes are not clearly
marked.  Emmers maintains that since the
lanes on 5th Northwest Street are not clearly marked, crossing into the opposite
lane is not a violation of this section of the Texas Transportation Code, which
specifically applies to roadways divided into two or more clearly marked lanes
for traffic.  

            The
State maintains that it was not required to show that a traffic offense was
actually committed; rather, it was only required to show that the officer
reasonably believed a violation was in progress.  Green v. State, 93 S.W.3d
541, 545 (Tex. App.Texarkana 2002, pet. refd) (while there is no requirement
that traffic regulation was actually violated, officer must reasonably believe
violation was in progress); Zervos v.
State, 15 S.W.3d 146, 152 (Tex. App.Texarkana 2000, pet. refd) ([I]t is
not necessary to show that Zervos actually violated the traffic laws.).  Gordon testified, upon questioning by the
State, regarding Emmers failure to maintain a single lane of traffic:

            Q.        [By State]  Tell the Judge if you see a traffic violation
here shortly [viewing video recording from Gordons patrol vehicle].

 

            A.        [By Gordon]  Right there, hes in the oncoming lane and he
swerves back into his lane.

 

            Q.        Okay. 
If he drives in the wrong lane, is that a ticketable offense?

 

            A.        Yes.

 

            Q.        Under the Transportation Code?

 

            A.        Yes.

 

            Q.        When he swerved over there, was that a
ticketable offense?

 

            A.        Yes.

 

            The
State maintains that Emmers committed a violation of Section 545.560 and that
even if there was no actual violation, Gordon nevertheless reasonably believed
Emmers violated this section of the Code.  Emmers complains that this conclusion is based
on a mistaken understanding of the traffic laws, and, therefore, cannot form
the basis of a reasonable suspicion for the traffic stop.[2]  While it is true that the State need not
establish with absolute certainty that a crime has occurred in order to show
reasonable suspicion, courts are not to defer to a police officers legal
conclusions.  Garcia v. State, 43 S.W.3d 527, 53031 (Tex. Crim. App. 2001).  Since Garcia,
Texas appellate courts have recognized that an officers honest, albeit mistaken,
understanding of the traffic law which prompted a stop is not an exception to
the reasonable suspicion requirement.  Fowler v. State, 266 S.W.3d 498, 504
(Tex. App.Fort Worth 2008, pet. refd); Goudeau
v. State, 209 S.W.3d 713, 716 (Tex. App.Houston [14th Dist.] 2006, no
pet.).  Thus, an officers suspicion of
an alleged traffic violation cannot be based on a mistaken understanding of the
traffic laws.  Goudeau, 209 S.W.3d at 716.  

            Emmers
argues that because the roadway in question was unmarked, Section 545.060
cannot, by definition, apply to his alleged movement from the right lane.  Therefore, Gordons conclusion that Emmers
failed to maintain a single lane of traffic was based on a mistaken
understanding of the traffic laws.[3]  We disagree. 
Gordon did not testify that Emmers action of crossing into the oncoming
traffic lane was a violation of Section 545.060; rather, Gordon testified that
driving in the wrong lane is a ticketable offense.  Gordon further testified that he was unsure
if the offense of the failure to maintain a single lane of traffic required
marked lanes.  While it is true that the
cross-over here did not amount to a violation of Section 545.060, as that
section only applies to marked traffic lanes, such a cross-over supports a
reasonable suspicion that a traffic law violation has taken place.[4]

            Section
545.051 of the Texas Transportation Code provides that an operator on a
roadway of sufficient width shall drive on the right half of the roadway
unless passing another vehicle, an obstruction necessitates moving the vehicle
to the left of the center of the roadway, the operator is on a roadway divided
into three marked lanes for traffic, or the operator is on a roadway restricted
to one-way traffic.  Tex. Transp. Code Ann. § 545.051(a)
(West 2011).  Gordon testified that he
watched Emmers cross into the opposing lane of traffic.  The video recording from Gordons patrol
vehicle reflects an unmarked, unobstructed roadway.  

            The
fact that the roadway here did not have a center stripe is of no consequence in
making the determination of whether Gordon reasonably suspected the occurrence
of a traffic law violation.  Section
545.051 of the Texas Transportation Code does not limit the requirement of
driving in the right lane only to roadways marked with a center stripe.  Tex.
Transp. Code Ann. § 545.051(a). 
Moreover, the fact that the cross-over did not appear to be unsafe is of
no consequence in determining whether Emmers committed a traffic
violation.  Section 545.051 does contain
a safety exception for movement from the right half of the roadway.  See
Bracken v. State, 282 S.W.3d 94, 9899 (Tex. App.Fort Worth 2009, pet.
refd) (because Section 545.051(a) does not contain an unless movement can be
made safely exception to prohibition against crossing center, issue of whether
such movement could be made safely is irrelevant to analysis of reasonable
suspicion).

            Gordon
testified that Emmers drove left of center and then swerved back into the right
lane.  Gordons observation was enough to
create a reasonable suspicion that a traffic violation was in progress.  See
Rubeck v. State, 61 S.W.3d 741, 745 (Tex. App.Fort Worth 2001, no pet.)
(officers observation of defendants vehicle crossing center line one time
provided reasonable suspicion for traffic stop).  Moreover, the digital photograph taken from
Gordons patrol vehicle clearly depicts Emmers vehicle in Gordons lane of
traffic.[5]  Accordingly, we conclude that Gordon had
reasonable suspicion that a traffic violation was committed by virtue of the
fact that Emmers failed to remain in the right half of the roadway, in
violation of Section 545.051(a) of the Texas Transportation Code.[6]

            C.        Failure to Yield Right-of-Way

            Gordons
second justification of reasonable suspicion to stop Emmers was Emmers act of
backing into the Cornet, which amounted to a failure to yield the right-of-way
to oncoming traffic.[7]  Section 545.152 of the Texas Transportation
Code provides:

            Vehicle Turning Left

To turn left at an intersection or into an alley
or private road or driveway, an operator shall yield the right-of-way to a
vehicle that is approaching from the opposite direction and that is in the
intersection or such proximity to the intersection as to be an immediate
hazard.

 

Tex.
Transp. Code Ann. § 545.152 (West 2011).

            Emmers
contends that Gordon lacked reasonable suspicion to initiate a stop for failure
to yield the right-of-way because Emmers posed no immediate hazard to Gordon,
as required by the Code.  Gordon
testified that the stop was justified:

            Q.        [By Emmers attorney]  Okay. 
And then third is that he backed across the road?

 

            A.        [By Gordon]  Yes.

 

            Q.        And what violation is that?

 

            A.        Failed to yield right-of-way.

 

            Q.        Okay. 
Failed to yield right-of-way, vehicle turning left?

 

            A.        Or to oncoming traffic.  He failed to yield right-of-way to oncoming
traffic.  He backed in front of me.  I, essentially, had to yield to him by
stopping.

 

            .
. . .

 

            Q.        You speed up to 13 miles an hour,
correct?

 

            A.        Yes.

 

            Q.        Then you slow down to 11 miles an hour.

 

            A.        Okay.

 

            Q.        As you approach his vehicle, you slow
down to 8 miles an hour, correct?

 

            A.        I believe so.  I wasnt watching it.

 

            .
. . .

 

            Q.        And there was never any rapid deceleration
of speed?

 

            A.        No -- I didnt have to slam on my
brakes, no, I didnt.

 

            Q.        Okay. 
So to the extent the police report indicates that you had to stop
abruptly, that would not be correct wording?

 

            A.        . . . . Im not sure how accurate the
speed on that is -- is correlated with actual speed of the vehicle.  But, I can tell you from operating the
vehicle that I felt like I had to stop abruptly to avoid colliding.  If Id have maintained my speed, without a
doubt, I wouldve collided with his vehicle. 


 

            Emmers
contends there was no immediate hazard created by temporarily blocking Gordons
lane of traffic as he backed into the Cornet. 
The State maintains that Gordons testimony establishes that Emmers
actions created an immediate hazard. As previously stated, proof that a statute
was violated is not required to determine reasonable suspicion.  We, therefore, review the record before us to
determine whether Gordon reasonably thought Emmers had committed a traffic
offense.  Zervos, 15 S.W.3d at 152. 
Here, Gordon testified that he believed a collision would have occurred
had he not reduced his speed.  The issue
of whether this testimony supports a reasonable belief that a traffic violation
occurred turns on the evaluation of Gordons credibility and demeanor.  The trial judge is the sole trier of fact and
judge of the credibility of the witnesses and the weight to be given their
testimony.  Wiede, 214 S.W.3d at 2425. 
We could thus conclude that Emmers action of maneuvering his vehicle in
front of Gordons, causing Gordon to reduce his speed in order to avoid a
collision, provided a reasonable suspicion that Emmers violated Section 545.152
of the Texas Transportation Code.  See Tex.
Transp. Code Ann. § 545.152. 
However, because the evidence is clear that reasonable suspicion for the
traffic stop existed by virtue of the fact that Emmers failed to remain in the
right half of the roadway, we need not rule on this issue.

III.       CONCLUSION

            We
affirm the judgment of the trial court.

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

Date Submitted:          June
8, 2011

Date Decided:             June
23, 2011

 

Do Not Publish











[1]With
respect to the alleged offense of failure to maintain a single lane of traffic,
both parties identify the controlling statute as Section 545.060 of the Texas
Transportation Code.  Tex. Transp. Code Ann. § 545.060.  

 





[2]Emmers
contends that even if the lanes were marked, there would be no reasonable
suspicion here because the failure to maintain a single lane is a violation
only when movement out of that lane cannot be made safely.  Emmers maintains that his actions were not
unsafe.  See Tex. Transp. Code Ann.
§ 545.060(a)(2).  Because we find Section
545.060 of the Texas Transportation Code does not apply to the alleged offense,
we do not address this contention.

 





[3]The
State further contends that Gordons characterization of the cross-over as a
failure to maintain a single lane of traffic was not a mistake of law because Section
545.060(a) requires such movements to be made safely.  Because it contends Emmers movement out of
his lane of traffic was unsafe, the State maintains that Emmers reliance on Goudeau is misplaced.  We disagree. 
The statute does not create two, separate offenses.  Rather, Section 545.060(a) creates a single,
two-part offense of (1) moving out of a marked lane (2) when it is unsafe to do
so.  Fowler,
266 S.W.3d at 502; Hernandez v. State,
983 S.W.2d 867, 871 (Tex. App.Austin 1998, pet. refd).  





[4]While
the record indicates Gordon filed a police report, that report is not a part of
the record before this Court.  We decline
to speculate as to the statutory basis of the alleged violation reflected in
the report, if any. 





[5]At
trial, the video recording from Gordons patrol vehicle was played.  The exhibit provided in the record here
depicts only a digital photograph of Emmers vehicle in Gordons lane of
traffic.

 





[6]Even
though the parties do not address the application of Section 545.051 to the
facts before us, this Court is obligated to uphold the trial courts
evidentiary ruling under any theory of law that finds support in the record.  Gonzalez,
195 S.W.3d at 126.

 





[7]The
State contends on appeal that other specific, articulable facts inferred
intoxication, providing reasonable suspicion for the traffic stop.  Because we find reasonable suspicion for the
traffic stop existed due to alleged traffic violations, we do not address this
issue.